All right, we will proceed to the first case of the morning. The Village of Barrington v. the Surface Transportation Board. Mr. Streeter. May it please the court. In effect, this is a relatively easy case. That's what most and if needed to impose additional conditions. Plainly, the board realized that in 2008 it did not have the ability to comprehend or to anticipate everything that could possibly happen during the intervening period following the grant of authority. As a result, they put in an oversight period that would run until two years after CN completed all of its implementation of its operating plan. And that is a key factor to keep in mind because it's not 10 years from the date of the decision or from the date of consummation. It runs to a point that is two years beyond the implementation. Now, in January of 2017, Barrington, joined by the Illinois Department of Transportation, requested the board to fulfill its commitment to Barrington by focusing on the regional impact on US Highway 14. Now, 14 is taken care of by the Illinois Department of Transportation, not the Surface Transportation Board. The Surface Transportation Board, it's exclusive with regard to railroads. It has nothing to do with the national highway system. And this is, I think, a second key point that we've got to keep in mind, particularly in light of the Supreme Court's decision in Burlington Truck. Now, in order to demonstrate the fact that the crossing was far worse than what had been assumed by the board in 2008, that assumption was based on a series of projections that were provided by CN based on 2006 traffic that was handled by either the EJ&E or Canadian National. At the time, there was no crude oil being handled primarily by the railroads. The influx of containerized freight coming across from Prince Rupert Island had not yet started. The first container ship called on Prince Rupert, I think it was the week after the Canadian National actually filed its application with the board. So as a result, the projections could not possibly have included those movements. Counsel, just for a moment, could you explain to me how this Prince Rupert Island port reflects in this? Where is this oil coming from? Where is it going that it ends up coming through Burlington? Well, for Prince Rupert, it is containerized freight coming in from the Not oil? No, no, no. Okay, the brief wasn't clear on that. All right. The crude oil came out of the Alberta oil fields, which really had been started development, but it was only after the shale developments in the Bakken crude that all of a sudden the pipelines couldn't handle the flow. So at that point, crude by rail evolved. So as a result, in the meantime, of course, Canadian National had done a tremendous job of building up its tracks in Canada so that it could start hauling longer and heavier trains. So as a result of this, by the time that the combination of the crude coupled with the containerized freight coming in from the Orient, you had two massive flows of traffic through Barrington that had not been anticipated. Is this traffic basically United States bound, or is it going up through Michigan and back into Canada? The containerized freight is headed for Joliet and on to Memphis, where CN has been developing some huge facilities to handle containerized freight. The crude oil is primarily headed for the Texas and Louisiana Gulf Coast, because that's the only refineries really in the United States that can handle the refining of the real heavy crude that is produced that comes out of Alberta. Now, are we, as a practical matter in this lawsuit today, are we worried about whether there will be a grade adjustment at this crossing, or is this a matter of who pays for it? Well, you're going to have to vacate the decision because the court, this is the arbitrary and capricious standard. You cannot substitute your judgment for that of the board. However, the board has an obligation to make findings that are satisfied by substantial evidence of record and that clearly point to their line of reasoning. Yeah, but do you agree, I think you do, that this court lacks jurisdiction to review claims of material error by the board? No. By the board. You have authority to do that. Particularly, I mean, when I file, let me back up one second. When I file the petition for review, when you read the actual petition, it makes it very clear that I'm referencing back to the April 2017 decision. Now, I made a mistake by not including the nine pages of the actual decision, but the point is I made it very clear that we want you to look at particularly 2017. The other thing that I tried to do was ask. No, but I don't think you're answering my question. Okay. Do you disagree, then, with the principle that your opponents go to some argue that this court cannot review material errors that you claim the board made? Totally disagree. Okay, so your appeal is basically based on the fact that you believe the board made material errors of fact. That is true, and that they did not create a path that this court can follow If you take a look at SUPAP 1, it's the data for trains on the EJ&E line segments in the United States handled by Canadian National EJ&E. The problem comes in that it stops as of 2008. They never got beyond 2008 to ever consider what the actual impact of this transaction was on Barrington in 2017. Well, Mr. Streeter, I'm looking at the board's decision of April 26, 2017. Okay. And the railroad acknowledges that the PPR traffic has increased, but it didn't show that it was running through Barrington and that it was materially impacted. Some of it was, and a great deal of it was. Otherwise, if you go back to the record, you see that CN testified that they had been investing heavily in the intermodal container down at Joliet and at Memphis. You wouldn't be doing that, spending the money to bring in these containers if you didn't have the capacity to handle them. And furthermore, the rise of containers has been, if the board had been carefully following what's gone on for the past few years, there is no doubt they would have seen from the trade press, if nothing else, that the containerized movements coming in from Prince Rupert are sky high. Yeah, but I guess the point I'm raising is what can we do with the board's finding, or what should we do with the board's finding, that it results in minimal additional trains and the fact that it's just a small portion of the PPR traffic going through Barrington? I mean, are they wrong in that finding? They're right that the number of trains has not increased. Take a look at page A5, yes, A5, excuse me, A4, footnote 5, where they find, and this is strange to put a finding in a footnote, there is no material error in using train load data to determine the impact of trains moving through Barrington. However, what is meant by train loads, when OEA did its study, it clearly pointed out that there are three parts that go to that, the speed of the train, the length of the train, and the number of trains. We have tried desperately to get the board to require CN to give us the length of the trains that were moving so that we could actually prepare the analysis that they said, oh, you didn't prepare an analysis for us. How can you prepare the analysis if you don't have the train lengths? You could observe them. We did. And what did they do? In 2017, they came in and their line was at the point, and they said, well, they showed that it was lower. Now, you're the judge, you read the decision, how much lower? They were running 10,000 plus length trains. This little track here says that the most that they would be doing was 6,829 trains of the length of the train. 11,000 feet, 10,000 plus is twice the length practically of what they based their projections on. In other words, I want them to complete the process. They started off in good shape. We're not contesting the projections. The original projections, they had facts to back them up. What they've done now, though, is they arbitrarily said, well, at 2015, the projections are no good, but because of changes in industry, because of lower energy prices, because of one other thing, that we don't have any need to go back. They said there's no basis for the board to conduct an independent traffic review nearly 10 years after the transaction was approved. But again, that's 10 years after it was approved. Did they ever give you what the actual impact is today? They've never told Barrington. It seems to me that they, at some point, have got to accept the responsibility, if they're going to have oversight, then complete it. They have not completed it. We're left high and dry. The state of Illinois is going to be called upon, and the taxpayers to pay the bill. They didn't ask CN to come in and take over the EJ&E. Everybody was happy. IDOT came in and they testified. They did another environmental study after the board did. Based on that environmental study and the engineering analysis that they did, they determined it has to be done. They're not a party to this proceeding, are they? They're not formally. Can you answer me another question, please? Because maybe it's just a matter of my own ignorance. But you've appealed twice to the D.C. Circuit. Yes. Why does this case end up in this circuit at this point? This is home court advantage. I mean, this is Illinois. The D.C. Circuit basically never looked at the completed project. We tried to get them to look at it at first. The council at the time didn't mention it in the opening brief. I went back the second time. We argued. Basically, the court said, no, you're trying to retry the beginning. That's the reason when I filed the petition for review and did it in the way I did, I wanted to make it very clear. I'm not contesting anything about the original 2008 decision. I wanted you to take a hard look at what's going on in 2017. Go back, vacate the board's decision, just like the Supreme Court told the three-judge district court back in the trucking case, Burlington Trust. You should have vacated it. Has this particular situation occurred before where a party comes to a different court of appeals on a motion for reconsideration of a petition to It's kind of like asking for a second opinion, or if you want to be uncharitable, it's playing the D.C. Circuit against us. No. You guys in the Atchison-Topeka case said, look, we don't care what the Ninth Circuit did. This case is before us, and now we're going to make the decision based on what we find to be the law. There's another example right there, which involves the Seventh Circuit. It seems to me that we're entitled to come to this circuit. We are venued in this circuit. Could you have come to this circuit in the first two cases? We could have, but the council made the decision not to. That wasn't you. Do you want to reserve some time? Yes, please. Judge Gettleman asked if you were the counsel in the earlier case. No. If I had been, I'd have been here. Thank you, Mr. Streeter. Ms. Miller? May it please the Court, my name is Barbara Miller, and I am here on behalf of the respondents. Ms. Miller, perhaps at the beginning, you're the expert on the board. Is it proper to have this action here as opposed to in the D.C. Circuit, and why? This court does have venue, and therefore it is legally appropriate, but I think Your Honor was correct in that what appellants or petitioners trying to do here is forum shop and look for a court that may come to a different conclusion, and frankly one that's going to directly contradict some of the conclusions that the D.C. Circuit has already come to, which brings us to the crux of part of the problem here, which as petitioners' counsel already admitted, its petition here is based on claims of material error. The vast majority of Barrington's arguments are that the board materially erred in 2008, 2012, and 2015, as well as in the 2017 denial to reopen. It is well established, however, that agency denials to reopen or reconsider prior decisions based on claims of material error are not reviewable by the court, and while Barrington contests this proposition here, it provides no support for that position, nor has it explained why the Supreme Court's decision in BLE or this court's decision in advanced transportation or Snyder's don't apply here. And no matter how Barrington tries to repackage or reframe these arguments, the board made an error in 2008, in 2012, in 2015, or in the 2017 denial of renewal, undeniably claims of material error. But in 2017, this was still within the oversight period. Is that correct? That is correct. What's the purpose? Well, when the petition to reopen was filed, the oversight was still open. Fine. And what's the purpose of the oversight period? Isn't it to review the accuracy of the projections that were made for the original decision? The purpose of the oversight was, one, to continue to monitor one of the board's primary considerations, which are competitive impacts and effects on the market. It was also to monitor the implementation of the mitigation conditions that were imposed, to ensure that they were complied with, and also to monitor the impacts of CN's operations. Right. And isn't that exactly what they're complaining about now, that some of those projections actually weren't accurate at the time they looked to reopen this, during the oversight period, and that they're claiming that these trains are now so long that they block every intersection in Barrington? If that's a fact, isn't that something that the board should have considered? Well, there's several layers of response to that question, Your Honor. There are several questions there. The first is a procedural one, which is what they are essentially arguing is that by mere fact of the imposition of an oversight period, the standard of review and the standard for reopening and reconsidering our decision is different, and that is simply not correct. They have made this argument. They made it in 2011, and the board rejected it. And when the board rejected it, that decision was affirmed by the D.C. slightly different guys. We rejected it again, and they chose not to appeal that decision. So first of all, the oversight issue and whether we had a different standard for reopening under that oversight condition has been rejected. It's a material error claim that is not reviewable by this court. However, even if it were before this court, what the evidence shows is that the were actually quite accurate. If you look at the predictions as to train length, train speed, and train numbers taken together, they are not materially different than what was predicted in 2008. While petitioners talk at length about these 10,000-foot trains that are blocking all the intersection, what petitioners are doing is essentially misrepresenting their own data. Their own data shows that some of the trains are 10,000 feet, and quite a few of those trains are significantly less than that. And what the board looked at in 2008 was the average train length, not the maximum train length. And the average train length in 2008 that was predicted was actually quite close to what the average train length is in Barrington's data that they presented in their 2017 petition. It is not a 10,000-foot average. It is a 7,000-plus foot average. And therefore, the predictions that we relied on in 2008 are relatively accurate. And the reason we looked at things such as train length and train speed and the number of trains was not to look at those numbers in a vacuum. It was to look at those numbers and how they impacted vehicle delay in this community. What would constitute using those figures a material error by the board? Well, first of all, I would say that even if it were a material error, it would not be reviewable here. But new evidence that might justify the board reopening its decision, you know, as an adjudicatory board, I can't get ahead of a board decision. But what I can say is that what we have here is not even close. What we have here are accurate train length and train number predictions. What we have here is a number that Barrington has presented that is actually less total vehicle delay at this intersection than Barrington presented in 2008 and the board considered in 2008. And despite those predictions, we concluded that a grade separation was not warranted. The D.C. Circuit affirmed this decision. And when they came back in 2011 and challenged our decision, we found that because the vehicle delay numbers were less in 2011 than what we had considered in 2008, it didn't warrant reopening our decision, and the D.C. Circuit once again affirmed that decision. Does the board take into consideration vehicle delay depending on hours of the day? Is that a factor? In this particular case, in 2008, because Barrington expressly stated and asked us to consider the impact, they were concerned primarily about the impact during rush hour and the impact beyond simply this U.S. 14 crossing, but the impact all in sort of the regional area. In response to that concern, the board conducted a study that did focus on the rush hour impacts and that looked at the impact further out than just the U.S. 14 crossing. And it was based on this study that we did, again, in direct response to the specific concerns that Barrington presented, that it was concluded that because of the preexisting congestion in the area and the preexisting capacity constraints and the complicated nature of the traffic and the intersections in this area, that the impact of the CN trains on top of the already existing problems was not significant, it was minimal, and that because of these preexisting constraints that a grade separation would not address, a grade separation would be of minimal benefit and was not warranted. And the board's use of that study and reliance on that study was affirmed by the D.C. Circuit twice. Barrington has also raised today the issue of the fact that IDOT is entitled to a special deference because of the fact that it joined its 2017 petition to reopen. First of all, there are, again, procedural problems with this argument. First of all, it's a material error argument that was raised and rejected by the board in 2015. It is also waived here today because they did not raise this argument in their 2017 petition for reconsideration. Even if, however, we were told... Which 2017? The reconsideration petition, the second one, which is the only order that is on appeal here. Contrary to petitioners' claims, they very clearly in their petition here appealed solely the 2017 reconsideration order. If you look at their filing here, their petition, the opening sentence says, we are appealing the October 2017 petition for reconsider... Excuse me, decision on reconsideration. Its closing paragraph in that same petition is, we are asking you to reverse the board's October 2017 reconsideration decision. This is on all fours with Entravision. It is quite clear that they have waived their appeal of the 2017 reopening petition, which is why an argument that they failed to raise in their 2017 reconsideration petition is waived and not properly before this court. Even if, however, IDOT... This argument concerning IDOT and deference to IDOT were properly before this court, what IDOT did in the petition to reopen was come to us and, as an interested party in this proceeding, make a conclusory statement about why a grade separation is needed. As noted in our 2017 decisions, they provided no data supporting this. And an interested party coming to us, making a conclusory conclusion, the board cannot simply accept that conclusion without more data, which is what we required, and that they failed to present. Now, it's a question of not whether the grade separation is needed, but whether or not it's needed because of the increase in traffic. Is that right? Caused by the... That is correct. And as the board's study in 2008 found, and which was confirmed by Barrington's own study in 2011, the congestion at this intersection and the vehicle delay caused by the pre-existing conditions that are independent of CN's trains far outnumbers the amount of delay that is caused by CN's trains. Ms. Miller, in the briefs, I want to talk about the board using a benchmark of 40. Why 40? Where does that come from? The 40 hours of total vehicle delay threshold is from the Federal Highway Administration criteria. And there are three threshold criteria. The 40 hours of total vehicle delay is one of those three criteria. And our use of those criteria was, in fact, challenged in 2008 in the D.C. Circuit appeal, and the D.C. Circuit expressly found that it was reasonable for us to use the FHWA threshold criteria. I see. Thank you. And what is also important about that threshold criteria is that even if you meet that threshold criteria, you are not entitled to a grade separation. Meeting that criteria or any of the threshold criteria simply means that the board conducts additional analysis of the intersection, looking at the individual characteristics of that intersection, and considering factors such as safety-related vehicle exposure, regional traffic flows, pre-existing congestion, and pre-existing capacity constraints, all to determine what, if any, mitigation measures may be appropriate in this situation. And here, one, in addition to the fact that simply meeting that delay doesn't mean that you get a grade separation as a mitigation condition, as evidenced by the fact that there were multiple intersections that met these threshold criteria, that did not receive that as a mitigation condition in 2008. But also, the board went ahead, and despite the fact that the U.S. 14 crossing did not meet any of the threshold criteria, because Barrington had raised these concerns, we went ahead and conducted that additional analysis anyway. And it was based on this additional analysis that we concluded that because of pre-existing conditions, that a grade separation would be of minimal benefit, and therefore a grade separation at U.S. 14 was not warranted. And in fact, Barrington's own study in 2011, as I may have already mentioned, supports this conclusion. Its own study found that 260 hours, or approximately 70% of the vehicle delay, was attributable to pre-existing conditions, and not the addition of the CN trains. And it is the addition of the CN trains and the effect of this specific transaction that we are addressing in the mitigation conditions. As a result, over the course of the last 10 years, the board has carefully and comprehensively considered each of Barrington's requests to reopen or reconsider its decisions in this acquisition proceeding, including the 2017 request to reconsider, that is the subject of this appeal. If, just hypothetically, if CN was to start running 2-mile-long trains 10 times a day, would Barrington have an avenue to bring before the board that condition? The regulatory standard for reopening applies regardless of when the transaction was approved. And therefore, if they were able to come to us with new evidence or changed circumstances that warranted reopening, we would consider it, even though the oversight period had ended. However, since we are 10 years after this acquisition was approved, the connection between CN running trains on this line and this transaction becomes more and more attenuated as time passes. There are many factors that can consider that can affect the number of trains that CN is running that have nothing to do with this acquisition proceeding. The market changes, fluctuations in commodity pricing, all of this influences the number of trains that CN runs and has nothing to do with the acquisition. And all the board addresses is the effects of the acquisition itself. Since I see I am running into my intervener's time, I will close with, unless the court has more questions, for these reasons and for those discussed in Barrington's brief, this court should dismiss Barrington's claims of material error and deny its remaining claims. Thank you, Ms. Miller. Mr. Hirsch. I may please the court. I've been privileged to act as CN's counsel throughout these lengthy proceedings and subsequent appeals, including the two visits to the D.C. Circuit. But after almost 10 years, after the board issued its final decision, I'm here to ask the court to put an end to these proceedings. You just asked a question about what happens if CN starts running two-mile trains 100 times a day. Well, the fact is, at some point, this line should be like any other railroad line in the country, and there are processes under state and federal law for doing grade separations. And by the way, in Illinois, if this grade separation were to happen, we would actually be required to contribute to that. 5% of preliminary engineering, right-of-way acquisition, and construction costs. Now, there's been a lot of talk about the numbers, so let me try to clarify that a little bit. As the SCB's counsel mentioned, the prior decision, the petition to reopen, is really not on review here because the petition for review did not seek review of it. And the numbers that Mr. Streeter has been citing are all numbers and all arguments that have been made in prior decisions, and it's quite clear under BLE and Schneider that claims of material error for prior decisions are not reviewable. But what are the numbers, OK, on the ground? Train frequency? It had been projected of 20.3 trains, OK? And in fact, it was fewer than that. In 2016, it was 18.1. So we had a nice 10% drop in the number of trains. All these arguments about new traffic from oil and new traffic from Prince Rupert, they come down to, well, how many trains really were there? And the fact is, those arguments don't bear out. But they're saying they're longer and slower. Let's talk about that. Train length? We put in evidence about train length, and it was slightly different, but it was nothing like the 10,000 feet. As STV Council said, the original estimate was 6,829 feet. That was the projection. And it turned out in 2015, 2016, it was 7,657 feet, not 10,000 foot average. That's about a 12% increase, about balanced with the length. Speed? Now, the speed did decrease. It decreased for a good reason. There's a diamond crossing that's not far from Barrington, and there had been an accident at a different diamond, and CN, as a general matter, had reduced the speeds through these diamonds by about 10 miles an hour. So, yes, the speed did decrease a little bit. But as we showed, if you calculate the effect of that on every individual train, given even an assumption of the length, etc., it makes less than one minute difference per train. And as I think was mentioned also, in terms of timing of trains, the trains in Barrington tend not to run during rush hour. And there's a good reason for that. Is that in the record? Yes, it is. And the reason is that the Metro trains come through at this other diamond, and they have priority, so CN can't get, and they run during rush hour very heavily, so CN can't get through. Thus, it doesn't run much during rush hour. Now, there's some other numbers here that have been thrown out. About the only new number that should be on review is this 118 that you've seen appellants throw out and compare to 2.49. I'm sure you could not have missed that on the briefs. To understand these numbers best, I want to direct your attention to a table that I think will help you understand this whole case. And that's at RA 193 in the record. This table is taken from the 2011 Village of Barrington study itself. And what you see there is not a 2.49 for pre-acquisition delay. This table is the VISM numbers that they use. And we pointed out in our filings that VISM is quite different. So the 118 they're throwing out is a VISM number. VISM takes into account not just, as the board did, a calculation of what delay is specifically caused by the railroad if other conditions are normal and there's not other severe pre-existing congestion issues. That's where the 2.49 came out. VISM takes into account much more. It takes into account a cumulative delay from all sources in the roadway network. So what you'll see is a number of 207. So Mr. Streeter says things were great before the transaction. Well, there was 207 minutes of delay under the VISM calculation prior to the acquisition. That rises in 2015 to 467 without a transaction. They're throwing up against that an increase that they eventually claim now was 118. And by the way, that is really not supported in the record. They basically said somebody went off and calculated that number. The other thing you'll see is on this RA193, there's a number of 116 in the place where it's the change they claim due to the acquisition. That number is the number that's been bouncing around and that they keep using all of their evidence to demonstrate how much they say we increased. Well, it was 116 here. Later now they're saying it's 118. But in the original proceeding, it was 135. They said that we were responsible for 135 minutes of delay, more than we're seeing now. And of course, that was not found convincing by the board. That case was reviewed in Barrington I by the D.C. Circuit and rejected, and it was reviewed in Barrington II when they came back with another argument based on the same number. It was specifically rejected there. I can see I'm out of time. Thank you for your indulgence. You can make an concluding remark. I didn't want to cut you off, Mr. Hirsch, but I just... Well, all I'd ask is that the court show the board the high degree of deference to which it is entitled and deny Barrington's petition. Thank you, Mr. Hirsch. Mr. Schrader. While he's still around with that form, I don't have it with me, but if he looks down at the very last column, they've taken the position if you put in a grade crossing at 14 that it wouldn't have any impact on the overall city of Barrington. That very study shows that a single grade crossing at 14 is going to lower not only the delay at 14, but also at Illinois 59. Another thing, they want to talk about the 135 to 205 hours. They want to talk about it now. Go through and try to find those figures in any of the board's decisions in 2008. It's not in the FEIS. It's not in the decision. For some reason, those figures were put into the record as of October 1, 2008. Instead of addressing it at that time, why did OEA go into this peak period analysis that focused on the periods of time when the fewest number of trains were going through? Now, it doesn't make sense. If it's 135, why didn't they treat it as substantially affected at that time? They had the evidence. They decided to suppress it. Is it correct that you are appealing only the October 2017 denial of reconsideration? I'm appealing, as the actual petition says, both the April and the October. But you've asked us to reverse only that October 2017 ruling, correct? Doesn't that limit the scope of review and the standard of review? There is, when you can show that from the rest of the petition, even the D.C. Circuit has acknowledged the fact that it's not a fatal error. Now, I'll accept the responsibility and the blame for putting it. I was simply trying to make it clear that I'm not fighting about 2008. This is a totally different case, and that's the reason that material error should apply here. Look at page SA351. This is the chart that shows that in May of 2016, 16% of the trains were over 10,000 plus feet. April 2016, 19%. I didn't have access to those figures in 2008, neither did the board. That's the reason they decided to have oversight. Having said they're going to do it, why didn't they do it? Now they want to say, oh, all he wants to talk about is material error. I want to talk about the here and now, the actual situation that exists before January 23, 2017. The board has never come anywhere near it. Did they discuss the 16%, no. They said, oh, they showed there's a little bit more. What is a little bit more? Council can't tell us. The board hasn't told us. CN says, well, we're running at moderately less speed. It's 30% less. As we made the comment in our brief, if you have a 30% drop in earnings, somebody's head's going to roll at CN. In fact, recently they had a slowdown and somebody's did. So it's totally unfair to sit and say that we are only trying material error. One other thing, if you go from 2.49 to 40 hours of delay, that's a 1,506% increase. 2.49 to 98 is a 3,835% increase. 2.49 to 118 is a 4,638% increase. And that's just looking at the facts. The board looked at that and they said, oh, it's a 92%. Their math is faulty from the very outset. But that's a material error argument, correct? I'm just pointing it out. I understand. But if we agree with them that the court lacks jurisdiction to review a material error argument on a motion to reconsider, that's the end of this, isn't it? Yes or no? You're going to have to make the call. Yes or no? I mean, given my question, isn't it a yes or no? My position is that that is not what the intent that we filed the petition for review. We wanted the court to look at 2017 and then face it. When I went in, when you file for reconsideration at the board, they changed their rules after the early cases that the board has relied on, that CN and the board have relied on. You can now go in for reconsideration on new evidence, changed circumstances, number one. Number two, material error. I went in on new evidence. Okay. I think I'm going to have to ask you to make a concluding remark, if you wish, Mr. Strickland. Thank you very much. All right. All right. Thanks to all counsel. The case is taken under advisement.